UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEW YORK CIVIL LIBERTIES UNION,<br><br>Plaintiff,<br><br>v.<br><br>ADMINISTRATION FOR CHILDREN AND FAMILIES, OFFICE OF REFUGEE RESETTLEMENT, and U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Defendants. | Case No. 1:20-cv-183<br><br>**COMPLAINT** |

# INTRODUCTION

1. The New York Civil Liberties Union brings this action under the Freedom of Information Act to vindicate the public's right to know the Office of Refugee Resettlement's role in a multi-million-dollar effort, spearheaded by the U.S. Department of Justice, to find, arrest, detain, and deport unaccompanied immigrant children. Under cover of a grant program ostensibly aimed at "strengthening community capacity to stem violence and reduce youthful offending and victimization, improving the response to children's exposure to violence, and enhancing public safety," DOJ has placed ORR at the fulcrum of one of the Trump administration's newest immigration-enforcement strategies: levying specious gang allegations against unaccompanied immigrant children to deport them or otherwise deny them immigration benefits.

2. ORR is not a law-enforcement agency. Housed within the U.S. Department of Health and Human Services' Administration for Children and Families, it is the federal agency responsible for caring for immigrant children who enter the U.S. unaccompanied, often after

fleeing violence and persecution in their home countries, until they can be placed safely with U.S. parents or other sponsors.  ORR has a clear statutory mandate: to act in the best interest of the children in its custody and promptly release them to relatives where possible.  And its mission is to "incorporate[] child welfare values" into the care and placement of unaccompanied children.

3. But in sharp contrast to ORR's mandate and mission, the grant program in question leverages ORR's relationship with children in its care to dramatically expand collaboration between federal agencies and local law enforcement.  Despite growing public outcry concerning the government's aggressive immigration enforcement tactics — particularly those targeting children — details about the grant program remains shrouded in secrecy.  Among many unanswered questions surrounding the program are those concerning the participation of ORR — a child welfare agency — in that effort.  The grant program explicitly requires grantee law enforcement agencies to establish information-sharing protocols with ORR, ostensibly to facilitate transmission of sensitive information related to the unaccompanied children in ORR's care.

4. On August 12, 2019, the NYCLU filed a FOIA request with ACF seeking records concerning ORR's connection to the grant program.  In its request, the NYCLU sought expedited processing and a waiver or reduction of fees.  To date, over four months since the NYCLU's original FOIA request, neither ACF nor any of the other defendants has released records or otherwise responded to the NYCLU's FOIA request or administrative appeal.  This denial of the NYCLU's request flouts the defendants' obligations under FOIA.

5. The public is entitled to know ORR's role in the grant program and, in turn, how the grant program impacts immigrant youth and their families.  Accordingly, the NYCLU seeks

an injunction requiring the defendants to conduct a reasonable search for documents responsive to the FOIA request; make the requested records promptly available to the NYCLU; justify with detail and specificity the withholding of any information, including the basis or bases of any claimed FOIA exemptions; waive any processing fees; and grant the NYCLU's request for expedited processing. The NYCLU also seeks reasonable attorney's fees and costs.

## JURISDICTION AND VENUE

6. The Court has subject matter jurisdiction over this action pursuant to 5 U.S.C. §§ 552(a)(4)(B), 552(a)(6)(E)(iii), 702, 704, and 706; and 28 U.S.C. § 1331.

7. Venue is proper in this district pursuant to 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1391(e).

## PARTIES

8. Plaintiff the New York Civil Liberties Union is a non-partisan, non-profit organization incorporated under the laws of New York and with its principal place of business in New York, New York. The NYCLU is the New York State affiliate of the American Civil Liberties Union and has approximately 190,000 members statewide. The NYCLU's mission is to defend and promote the fundamental principles and values embodied in the Constitution. As part of this mission, the NYCLU is committed to ensuring governmental accountability and transparency, and seeks to inform the public about the conduct and integrity of its government in matters of civil liberties and civil rights. Obtaining information about governmental activity, analyzing that information, and disseminating it widely to the press and the public are critical and substantial aspects of the NYCLU's work and among its primary activities.

9. Defendant U.S. Department of Health and Human Services is a department of the Executive Branch of the U.S. government and is headquartered in the District of Columbia. HHS is an agency within the meaning of FOIA.

10. Defendant Administration for Children and Families is a component of HHS and is headquartered in the District of Columbia. ACF is an agency within the meaning of FOIA.

11. Defendant Office of Refugee Resettlement is an office within ACF and is headquartered in the District of Columbia. ORR is an agency within the meaning of FOIA.

## FACTS

### *ORR's Role in Caring for Unaccompanied Children*

12. Each year, thousands of children travel to the United States from foreign countries. In recent years, many of these children have come from Central America and Mexico, fleeing violence, persecution, and abuse. Some children come with family members, but many make the perilous journey to the U.S. alone, seeking refuge from dangerous circumstances in their home countries.

13. This extremely vulnerable population is typically taken into ORR custody shortly after entering the U.S. Unaccompanied children remain in the agency's custody until ORR is able to safely place them with a U.S. parent, relative, or other sponsor during the pendency of their immigration cases.

14. ORR has a clear statutory mandate: to act in the best interest of the children in its custody and promptly release them to parents, relatives, or other sponsors where possible.[1]

15. According to its own website, ORR "incorporates child welfare values"

---

[1] *See* 6 U.S.C. § 279(b); 8 U.S.C. § 1232.

into the care, custody, and placement of unaccompanied children.

16. The unaccompanied children in ORR's care, who often endure high levels of trauma, rely on ORR and the local provider facilities with which ORR contracts to provide for their basic needs, including food, clothing, housing, education, and medical and mental health care.

17. In the course of caring for children in its custody, ORR and the local facilities with which it contracts retain large amounts of information about the most intimate aspects of these children's lives. ORR learns, for instance, about the child's mental health and medical history; any violence or abuse the child endured in their home country; specific details about the immigration case of the child and their family members; and personally identifiable information about the child and their family members, like birthdate, and country of origin.

*Operation Matador and the School-to-Deportation Pipeline*

18. The grant program at issue in this lawsuit is just the latest effort in a longstanding campaign by the Trump administration and federal immigration authorities to target unaccompanied immigrant children around the nation.

19. The NYCLU and other media outlets have voiced serious concern about local law enforcement agency partnerships with school districts and federal immigration authorities, arguing that these partnerships create a "school-to-deportation pipeline."

20. Much of the concern regarding the school-to-deportation pipeline arose in 2017, when U.S. Immigration & Customs Enforcement launched "Operation Matador," a program that encouraged information sharing between federal and local law enforcement to enable ICE more easily to target youth for arrest.

21. Operation Matador allows federal immigration enforcement agents, in coordination with local law enforcement partners, to designate any immigrant child a "gang

associate" based on as few as two indeterminate criteria, such as frequenting a known "gang hangout," which could be any location, or wearing "gang colors," like blue.

22. Police officers stationed in schools are often key sources of such dubious evidence of alleged gang connection, collecting information and observations that can be shared with other law enforcement and federal immigration officials. Frequently, police officers in schools maintain close contact with students, whom they encourage to confide in them as unofficial counselors; and with school officials, whom they encourage to share otherwise confidential information contained in disciplinary records and other student files.

23. "Association" with a gang is not a crime, but children whom ICE deems "gang associates" are routinely arrested; transported thousands of miles across the country; and detained in highly restrictive ORR-contracted "secure care facilities," which closely resemble maximum-security prisons. Immigration agents often arrest and detain these children without any meaningful review of the gang allegations; without informing the children, their families, or their immigration counsel of the basis of the allegations; and without providing any opportunity to review or challenge the evidence.

24. This treatment is not only extremely harmful to the children and families it affects — it is unlawful.

25. Shortly after Operation Matador began in 2017, a district court in the Northern District of California granted a preliminary injunction against the government for unlawfully detaining a class of unaccompanied children at an ORR "secure care facility" — the Yolo County Juvenile Detention Center — based on unsubstantiated gang-affiliation allegations that the government did not allow the children to challenge.[2] In a decision later affirmed by the U.S. Court of Appeals for the Ninth Circuit, the district court found the plaintiffs, whom the NYCLU and ACLU represent, likely to succeed on their claim that the U.S. Attorney General, ICE, and ORR had violated their rights to due process, and ordered the government to provide children in the class a hearing within seven days of arrest. Over

---

[2] *See Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1205–06 (N.D. Cal. 2017), *aff'd*, 905 F.3d 1137 (9th Cir. 2018).

35 children received hearings and 30 were released from detention because the government's evidence of gang affiliation was either flimsy or non-existent.

26. As of December 2018, ICE had detained about 170 unaccompanied immigrant youth under Operation Matador, including a dozen students from Huntington High School in Suffolk County, New York. ICE detained some of these children on the basis of such trivial things as possessing drawings of their high school mascot or the area code for their home country, both of which ICE characterized as "gang paraphernalia."

*The Gang Suppression Grant Program*

27. Far from constraining partnerships with local law enforcement in response to the constitutional concerns that Operation Matador raises, DOJ has sought to expand information sharing between local law enforcement, immigration enforcement, and ORR.

28. In July 2017, DOJ's Office of Juvenile Justice and Delinquency Prevention issued a call for proposals for a new funding opportunity for state and local law enforcement agencies, a grant program entitled "Gang Suppression: A Law Enforcement and Prosecutorial Approach to Address Gang Recruitment of Unaccompanied Alien Children" (attached hereto as Exhibit A).

29. The grant program, which provides up to $1.2 million for each of six grantees, threatens to expand the harmful practices of Operation Matador. To date, a total of $4.8 million has been awarded to four grantees around the country: Suffolk County, New York; Dallas County, Texas; the Bernalillo County Sheriff's Department in New Mexico; and the Office of the Attorney General of Nevada.

30. The program, which explicitly targets unaccompanied children, tasks grant recipients with developing and implementing "a customized gang suppression strategy."

31. Among the program's five "specific objectives" is "creat[ing] information exchange protocols between local jurisdictions and other agencies, specifically ORR, to share information regarding [unaccompanied children] and their gang affiliations." To that end, grantees must "identify their key point of contact in ORR to be able to obtain

information regarding UAC" who have either "self-disclosed" or been identified as gang affiliated; "create protocols to establish the best method to securely transmit [gang intelligence] information to ORR's Post Release Service"; and "establish[] a plan to securely transmit and receive information from ORR related to UAC and their gang affiliation(s)."

32. Beyond requiring collaboration with ORR, the grant program also requires that grantees cooperate with the U.S. Department of Homeland Security on issues of immigration enforcement.

33. ORR's role as a collaborator in information sharing under the grant program is remarkable because ORR's statutory child-welfare mandate does not extend to immigration enforcement.[3]

34. There is significant public interest in understanding the grant program, the basis for its formulation, its objectives, its implementation through local law enforcement and ORR, and the potential consequences for immigrant youth.

35. There is a compelling need for the NYCLU to obtain this information so that it can disseminate accurate information to the public, serve clients, and promote political and fiscal accountability.

*The NYCLU's FOIA Request*

36. On August 12, 2019, the NYCLU submitted a FOIA request (the "Request") to ACF (attached hereto as Exhibit B).

37. The Request sought five categories of records related to ORR's involvement in the grant program. Specifically, the NYCLU sought:

---

[3] *See* 6 U.S.C. § 279(b)(1) (describing ORR's responsibilities as, *inter alia*, "coordinating and implementing the care and placement of unaccompanied alien children"; "ensuring that the interests of the child are considered"; "making" and "implementing . . . placement determinations" for such children; "implementing policies with respect to the care and placement of" such children; "overseeing," "investigat[ing]," and "inspect[ing]" facilities where such children reside; and "maintaining statistical information" about children in ORR's care).

(1) Any and all records concerning the Grant;

(2) Any and all records submitted to ORR by Grantees, and any entity with which a Grantee is or was collaborating pursuant to the Grant, regarding information sharing between ORR and Grantees;

(3) Any and all records exchanged between ORR and any other federal agency or department regarding information sharing with ORR pursuant to the Grant;

(4) Any and all inquiries and communications, not including gang intelligence, received by ORR regarding the Grant, and any responses to such inquiries and communications provided by ORR; and

(5) Any and all policies, procedures, protocols, or other rules governing the exchange of information between ORR and Grantees, including but not limited to policies, procedures, protocols, or other rules governing ORR's use of such information and ORR's transmission of such information to other federal agencies and departments.

38. The NYCLU applied for expedited processing under 5 U.S.C. § 552(a)(6)(E) and 45 C.F.R. § 5.27.

39. The NYCLU also applied for a waiver of search, review, and duplication fees under 5 U.S.C. § 552(a)(4)(A)(iii).

*ACF's Constructive Denial and the NYCLU's Exhaustion of Administrative Remedies*

40. As of the filing of this complaint, 150 days have passed since the NYCLU submitted the Request.

41. The defendants have failed to acknowledge or respond to the Request.

42. The plaintiff has exhausted all applicable administrative remedies.

43. In letters dated September 13 and October 21, 2019, the NYCLU submitted letters to ACF via certified mail appealing ACF's constructive denial of the Request, including the NYCLU's applications for expedited processing and a waiver or limitation of fees (attached hereto as Exhibits C and D).

44. The defendants have failed to acknowledge or respond to the NYCLU's appeal letters.

## CLAIM

45. The defendants' actions, including their constructive denial of the NYCLU's FOIA request and applications for expedited processing and waiver of fees, violate FOIA and HHS's corresponding regulations.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

a. Order the defendants immediately to conduct a reasonable search for all records responsive to the Request;

b. Order the defendants to disclose to the NYCLU all nonexempt records responsive to the Request;

c. Order the defendants to waive any search, review, and duplication fees associated with the Request;

d. Order the defendants to process the Request on an expedited basis;

e. Award the NYCLU costs and reasonable attorneys' fees incurred in this action; and

f. Grant such other relief as the Court may deem just and proper.

Dated: January 9, 2019
New York, New York

      Respectfully submitted,

      NEW YORK CIVIL LIBERTIES UNION FOUNDATION

By:   */s/ Antony Gemmell*
      Antony Gemmell
      Jessica Perry
      Amy Belsher
      125 Broad Street, 19th Floor
      New York, New York 10004
      212-607-3300
      agemmell@nyclu.org
      jperry@nyclu.org
      abelsher@nyclu.org

*Counsel for Plaintiff*